**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: March 4, 2025

S25A0114.  PINDLING v. THE STATE.

PETERSON, Presiding Justice.

After this Court reversed his convictions entered after his first trial, Michael Pindling was retried and once again convicted of malice murder and other crimes in connection with the shooting death of Robert Pett.[1] Pindling argues in this appeal that the

___

[1] Pett was found dead on July 13, 2013. In September 2013, a Lowndes County grand jury indicted Pindling and Deron Wallace for malice murder, felony murder predicated on aggravated assault, aggravated assault, armed robbery, possession of a firearm during the commission of a felony, and two counts of theft by taking. The grand jury also indicted Kathryn Cortez for armed robbery and possession of a firearm during the commission of a felony. At Pindling and Wallace's joint trial in May 2014, a jury found Pindling guilty on all counts and Wallace guilty on all counts except malice murder. Pindling timely appealed, and this Court reversed his convictions. See *Pindling v. State*, 311 Ga. 232 (857 SE2d 474) (2021). Pindling was retried at a bench trial in May 2023, with Pindling representing himself. The trial court found Pindling guilty of all counts. On May 2, 2023, the trial court sentenced Pindling to life without the possibility of parole for malice murder plus consecutive sentences of life for armed robbery and five years for possession of a firearm during the commission of a felony. The other counts merged or were vacated by operation of law. Pindling filed a timely notice of appeal from the judgment of conviction

evidence was insufficient to support his convictions, including because (1) the State's main witness was unreliable, (2) the evidence showed that others had access to Pindling's gun, (3) the evidence failed to satisfy the statutory accomplice-corroboration requirement, and (4) the evidence failed to exclude "a very possible theory" of Pindling's innocence. But the evidence was sufficient as a matter of constitutional due process and Georgia statutory law, so we affirm.

On the night of July 13, 2013, Valdosta police found the body of Pett, who had been shot, lying on the back porch of a vacant house at 213 Walnut Street in Lowndes County. A grand jury returned an indictment charging Pindling, Deron Wallace, and Kathryn Cortez with criminal offenses in connection with Pett's death. Jointly tried with Wallace in May 2014, Pindling was convicted of malice murder and other crimes. This Court reversed Pindling's convictions, concluding that the trial court plainly erred when it instructed the jury that the testimony of a single witness was sufficient to prove a

---

entered after retrial. The appeal was docketed to this Court's term beginning in December 2024 and submitted for a decision on the briefs.

fact without also instructing the jury about the requirement that the testimony of an accomplice must be corroborated. See *Pindling v. State*, 311 Ga. 232, 235-237 (2) (857 SE2d 474) (2021). Representing himself, Pindling was retried in a bench trial in May 2023.

Cortez, who had pleaded guilty to armed robbery of Pett and sentenced to ten years in prison, was the State's main witness at the retrial and gave the following testimony. Wallace and Pindling were cousins and were from New York. In July 2013, Cortez, Wallace, and Pindling all worked together. Cortez was in a romantic relationship with Wallace, and in the days before the shooting she and Wallace stayed in the back house at 710 West Hill Avenue in Valdosta, while Pindling stayed in the main house. At some point, Cortez saw Wallace and Pindling using Pindling's gun on the premises for target practice, shooting a red suitcase. Pindling proposed renting a car to travel to New York; he filled out the paperwork for the car rental, and all three contributed money for the rental. Pindling suggested robbing a random person for money for the trip, but Wallace suggested robbing Pett, saying they had met at a party.

On July 13, 2013, Wallace contacted Pett, ostensibly about buying some marijuana from him. Pindling, Wallace, and Cortez planned to meet Pett at a house on Walnut Street, a location proposed by Pindling. Pindling, Wallace, and Cortez drove over to the Walnut Street area that afternoon, but kept on driving when they saw a woman outside; Cortez told Pett over the phone that they would have to reschedule due to a family emergency. Wallace contacted Pett later that day and said they were ready to meet. They went back to Walnut Street and stopped at an abandoned house. Pindling was dressed in black and had his gun wrapped in a bag. Neither Cortez nor Wallace had a gun. When they arrived, Pindling went inside the house, while Wallace stood in the backyard leaning against the car. Cortez, at Wallace's direction, flagged Pett down, directed him to park his motorcycle, and led Pett to the back porch, where he stood with his back to an entrance of the home. Cortez bought marijuana from Pett, who pulled the drugs out of a bookbag. Pett, who was smoking a cigarette, took a call. Cortez heard three shots.

In her direct testimony, Cortez was somewhat unclear as to where she was standing when Pett was shot. At one point, she said, "I had an ounce of weed in my hand and I was looking down and then all of a sudden three shots went off." But when asked what she did when she heard the shots, she replied, "I was in the car, I don't know how I got there[,]" but she did not have anything in her hand at that point. Cross-examining Cortez, Pindling elicited Cortez's testimony that in a prior written statement she had said, "Michael came up behind him and shot him."[2] Pindling also asked Cortez whether she had testified at the prior trial that she did not see who shot Pett, and she responded, "I did not see but you were the only person who was with us."

Cortez testified that she returned to the car first, then Wallace got in the car holding Pett's bookbag, which contained a Ruger P95 handgun, a scale, marijuana, and Pett's wallet. Pindling returned to the car last, holding his gun. Pindling reported that he "had to kick

---

[2] In the written statement, admitted into evidence during the State's direct examination of Cortez, Cortez said, among other things, "Michael came up behind him and shot him[.] Devon grabs the bag[.] I am already in the car[.]"

[Pett's] lights out" because Pett had been making gurgling noises. The three went back to Pindling's house. They put Pett's bookbag and identification, along with some of Pindling's clothes, in a trash bag. While Cortez waited in a living room area, Pindling went into his bedroom, then reported that he had hidden both his own gun and the gun found in Pett's bag. About five or ten minutes after arriving at the house, the three left for New York. Cortez eventually persuaded Pindling and Wallace to return to Georgia.

The State presented significant evidence in addition to Cortez's testimony. Wallace, whose conviction and life sentence for felony murder from the prior joint trial had been affirmed by this Court, see *Wallace v. State*, 299 Ga. 672 (791 SE2d 836) (2016), testified for the State at Pindling's retrial. But Wallace was very uncooperative, maintaining that he did not want to testify and claiming not to remember many basic facts related to the case, including whether he was present for the shooting. Portions of recordings of two prior interviews of Wallace were played at trial, and the recordings were admitted into evidence. In the second interview, Wallace appeared

6

to agree that Pindling had shot Pett in the back, although he said he did not see Pindling shoot.

Alerted to the shooting by a neighbor who reported a disturbance on July 13, 2013, police found Pett's lifeless body, a cigarette in his left hand, on the back porch of 213 Walnut Street. They also found Pett's motorcycle, still warm and with keys still in it, next to the house. Police recovered three cartridge cases, three bullet fragments, and one bullet from the scene.

Police found several text messages on Pett's phone showing an exchange on the date of the shooting between Pett's phone and a phone later discovered to be registered to Wallace. In one message, Wallace apparently directed Pett to "Walnut and Magnolia." 213 Walnut Street is about two or three houses from the intersection of Walnut Street and Magnolia Street. Records also showed phone calls placed between the two phones throughout the afternoon and evening, with Wallace's phone last calling Pett's phone at 8:46 p.m. Reviewing cell phone records for Wallace, detectives noticed several calls to car rental companies in the area, ultimately leading them to

7

Southside Auto Sales. Records at Southside Auto showed that Pindling rented a vehicle there on July 12, 2013. The rental application listed 710 West Hill Avenue in Valdosta as Pindling's home and Wallace as the emergency contact. An office manager at Southside Auto testified that she rented a car to Pindling on July 12 and that there was another man and a woman with him when he rented the car, with Pindling paying part of the fee and the woman paying the rest. Surveillance video from the rental office was admitted into evidence, and the manager identified Pindling as the person shown on the video completing the rental application. Southside Auto records showed that in the days after being rented by Pindling, the vehicle travelled to New York before heading south. Pindling, Wallace, and Cortez were arrested on July 17, 2013, in Savannah, after they crossed the South Carolina-Georgia line.

Pett's sister, Emma Pett Klingenberg, testified that she and Pett drove to the south side of Valdosta on the afternoon of the shooting. Pett told her that they were going to meet up with men whom he had met at an Academy Sports store; he had previously

reported that the men were from New York and had helped him buy some ammunition beyond the store's normal per-customer limit. When Klingenberg and Pett turned onto Walnut Street, Pett made a phone call, and Klingenberg heard a female voice on the phone say it was not a good time to meet due to a family emergency and they would have to meet later in the day. Later that evening, Pett went out on his own, telling his sister that he was going to meet up with the men.

A receipt showed Pett's purchase of ammunition at Academy Sports on July 2, 2013. Surveillance video from the store showing Pett meeting up with two men and making a purchase on that date was admitted into evidence; the two men appeared to be the same two men shown in the Southside Auto surveillance video, one of whom was identified by the Southside Auto manager as Pindling. The cashier who handled the purchase at Academy Sports testified that at the time, the store had a limit of one box of ammunition per customer.

At Pindling's residence at 710 West Hill Avenue, which is less

than a mile from where Pett's body was discovered, officers found a maroon suitcase with suspected bullet holes, suspected marijuana, a scale, various nine-millimeter rounds and shell casings, and papers with Pindling's name on them. Inside the main house, they also found a Ruger P95 handgun in a black suitcase in a living area connected to a bedroom in the back house, and two Smith and Wesson nine-millimeter guns, one of which had been disassembled and was located in a chimney in the bedroom. The State's firearms examiner expert testified that the Smith and Wesson found in the chimney fired the three cartridge cases that were recovered from 213 Walnut Street, a cartridge case recovered from 710 West Hill Avenue, and a bullet that was recovered during Pett's autopsy. There was ongoing construction at 710 West Hill Avenue, and a building permit on the front of the residence listed the owner as Courtney A. Pindling.

The medical examiner who performed Pett's autopsy determined that the cause of Pett's death was multiple gunshot wounds. Two entrance wounds resulted from shots to Pett's back,

consistent with the gun being fired from four to twelve inches from Pett's body, and the third entrance wound was a wound to the front of his shoulder. The medical examiner testified that an injury to the victim's lip could be consistent with being kicked in the mouth.

1.    In his pro se appellate briefing, Pindling appears to argue that the evidence was not sufficient to sustain his convictions as a matter of federal constitutional due process, invoking the State's obligation to prove every material allegation in the indictment and every essential element of the crime charged beyond a reasonable doubt. In particular, Pindling argues that Cortez was not credible, both because she was an accomplice and because elements of her story conflicted with other evidence. We conclude that the evidence was sufficient as a matter of federal constitutional due process.

Under *Jackson v. Virginia,* 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979), we evaluate the sufficiency of the evidence as a matter of federal due process under the Fourteenth Amendment to the United States Constitution by determining whether a rational trier of fact could have found the defendant guilty beyond a

11

reasonable doubt.

> Similar to appeals from a jury trial resulting in a criminal conviction, on appeal from a bench trial, we view all evidence in the light most favorable to the trial court's verdict, and the defendant no longer enjoys the presumption of innocence. We do not weigh testimony, determine witness credibility, or address assertions of conflicting evidence. On appeal, it is the defendant's burden to show that the trial evidence was insufficient as a matter of constitutional due process to support his convictions.

*Session v. State*, 316 Ga. 179, 181-182 (2) (887 SE2d 317) (2023) (citations and punctuation omitted).

Applying that standard here, the evidence was sufficient to support Pindling's convictions for malice murder, armed robbery, and possession of a firearm during the commission of a felony. Based on Cortez's testimony, the trial court sitting as the finder of fact was entitled to conclude that Pindling participated in planning and carrying out an armed robbery of Pett, that Pindling fatally shot Pett in the back, and that Pindling attempted to hide both the murder weapon and the victim's weapon before fleeing the state. As noted above, it was for the trier of fact, not this Court, to consider

Cortez's credibility and any alleged conflicts in the evidence. And although Cortez's status as an accomplice meant that Georgia law required corroboration of her testimony, as discussed below, that requirement was satisfied by the other evidence presented at trial.[3]

In addition to the particular statutory arguments discussed below, Pindling argues also that the evidence was insufficient because the only evidence that he shot Pett was that the murder weapon was registered to Pindling and that he lived at the residence where the murder weapon was found. Pointing out that others, including Wallace, had access to that premises, Pindling relies on the so-called "equal access rule," which provides that evidence that others had access to a particular premises (or automobile) can rebut the presumption that the owner or resident of a premises (or owner or driver of an automobile) has exclusive possession of contraband found inside. See, e.g., *State v. Johnson*, 280 Ga. 511, 512-513 (630

---

[3] Our conclusion that Cortez's testimony was sufficiently corroborated obviates the need to consider whether satisfaction of Georgia's statutory accomplice-corroboration rule is required as a matter of federal due process. See *Baker v. State*, 320 Ga. 156, 165 (3) n.3 (907 SE2d 824) (2024).

SE2d 377) (2006); *Lindsey v. State*, 353 Ga. App. 231, 240 (4) (836 SE2d 563) (2019).

But that rule is merely a defense available to a defendant to whom a presumption of possession flows, and the defense is available only where the sole evidence of possession of contraband is the defendant's ownership or exclusive control of the premises. See *Johnson*, 280 Ga. at 513-514. Here, the State did not rely merely on Pindling's ownership of the gun or ownership or residence at 710 West Hill Avenue to show that he possessed the gun or that he shot Pett. Rather, among other evidence, the trial court heard Cortez testify that Pindling *carried* a gun to the scene of the shooting and hid in the house at 213 Walnut Street while she met with Pett, and her testimony and prior statement indicated that Pindling shot Pett. Thus, the "equal access rule" was not implicated. See id. at 514.

2. Pindling also argues that the evidence did not satisfy the statutory accomplice-corroboration requirement, OCGA § 24-14-8. We disagree.

Under our Evidence Code, "[t]he testimony of a single witness

14

is generally sufficient to establish a fact." OCGA § 24-14-8. "But there is an exception to that general rule: in felony cases where the only witness is an accomplice, 'the testimony of a single witness shall *not* be sufficient,' [OCGA § 24-14-8] (emphasis added), and a jury may not rely solely on an accomplice's testimony to find any fact necessary to sustain a defendant's felony conviction." *Henderson v. State,* 317 Ga. 66, 81 (5) (b) (891 SE2d 884) (2023) (citation and punctuation omitted). Here, the State has conceded (both in the prior appeal and in this appeal after retrial) that Cortez was an accomplice. See *Pindling,* 311 Ga. at 235-236 (2). Therefore, affirmance of Pindling's convictions requires evidence that is "independent of [Cortez's] testimony and directly connects [Pindling] to the crime or leads to the inference of guilt." *Head v. State,* 316 Ga. 406, 416 (2) (888 SE2d 473) (2023) (citation and punctuation omitted); see also *Sauder v. State,* 318 Ga. 791, 805 (5) (c) (901 SE2d 124 ) (2024) (accomplice-corroboration statute requires "some independent evidence tending to show that the defendant himself was a participant in the crimes"; "corroboration of only the

15

chronology and details of the crimes is not sufficient" (citation and punctuation omitted)). The independent corroborating evidence need only be "slight" and can be entirely circumstantial. See *Raines v. State*, 304 Ga. 582, 588 (2) (a) (820 SE2d 679) (2018).

Pindling emphasizes that in reversing the convictions entered after his first trial, we discussed the shortcomings of the evidence presented by the State at the first trial. See *Pindling*, 311 Ga. at 236 (2). But, besides involving a different trial record, the question before us on this appeal is a different one. In the prior appeal, the issue was whether the trial court's error in failing to instruct the jury on the statutory accomplice-corroboration requirement likely affected the outcome of the trial, i.e., whether Pindling's claim of instructional error could result in reversal of his convictions notwithstanding that it was unpreserved, under the test for establishing plain error. See id. We answered that question in the affirmative, noting that the evidence corroborating Cortez's testimony at the first trial "was far from overwhelming." Id. at 235-236 (2). Here, Pindling does not enumerate any error in jury

16

instructions; the second trial was a bench trial and thus did not involve any jury instructions, and we generally presume that the trial court knew and followed the applicable law. See *State v. Abbott*, 309 Ga. 715, 719 (2) (848 SE2d 105) (2020) ("Trial judges too are presumed to know the law and apply it in making their decisions, absent some indication in the record suggesting otherwise." (citation, punctuation, and emphasis omitted)). Rather, the question before this Court now is whether the accomplice-corroboration requirement was met at all. The standard for evaluating that question is whether there was at least *slight* independent corroborating evidence to support a finding that Pindling committed the crimes of which he was convicted. See *Raines*, 304 Ga. at 588 (2) (a). Indeed, in the prior appeal, we noted that the evidence at the first trial met that standard. See *Pindling*, 311 Ga. at 236 (2).

We reach the same conclusion about the convictions entered based on the second trial. The State presented evidence consistent with Cortez's testimony about the set-up of the robbery, shooting of Pindling, attempt to hide evidence, and flight to New York,

17

including the discovery of the murder weapon in Pindling's bedroom, as Cortez described it was hidden. Significantly, the State presented several pieces of evidence that corroborated Cortez's account of Pindling's involvement in particular. Surveillance video from Academy Sports showed Pett meeting up with two men eleven days before he was shot, and they appeared to be the same men who appeared in Southside Auto surveillance video the day before the shooting, one of whom was identified by a manager as Pindling. The murder weapon was found on a property that: Pindling listed as his home address on a car rental application the day before the shooting, contained papers with Pindling's name on them, and was apparently owned by a relative of Pindling.[4] Southside Auto records and testimony of the manager showed that Pindling rented a car before the day of the shooting, accompanied by another man and a woman and listing Wallace as an emergency contact, and then used

---

[4] Although the State in its briefing on appeal does not point to any particular evidence admitted at trial to the effect that "Courtney A. Pindling" was the name of Pindling's father, Pindling in cross-examining Cortez elicited her clarification that when she referred to the 710 West Hill Avenue property as his property, she meant his father's property.

that car to travel to New York with Wallace and Cortez before returning to Georgia. In addition, the admitted evidence included Wallace's prior statement in which he appeared to agree that Pindling had shot Pett in the back.

Taken together, this evidence was more than sufficient to corroborate Cortez's testimony under OCGA § 24-14-8. See *Golden v. State*, 310 Ga. 538, 541 (1) (852 SE2d 524) (2020) (considering evidence that defendant left the state soon after the crime as evidence he was guilty of felony murder); *Huff v. State*, 300 Ga. 807, 809 (1) (796 SE2d 688) (2017) ("[E]vidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime." (citation and punctuation omitted)); *Head*, 316 Ga. at 413-415 (applying rule that testimony of a second accomplice is sufficient to corroborate an accomplice's testimony to allow possible accomplices' statements to police to corroborate accomplice's testimony).

3. Finally, Pindling appears to argue that the evidence was insufficient to support his convictions under OCGA § 24-14-6, which

provides that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." But OCGA § 24-14-6 does not apply where the evidence presented includes direct evidence of guilt. See *Bradley v. State*, 318 Ga. 142, 144 (1) (897 SE2d 428) (2024). And Pindling's convictions were not based solely on circumstantial evidence, but on the testimony and statements of Cortez and Wallace, who were both eyewitnesses to the crimes. See id. ("Eyewitness testimony based on the witness's firsthand observations of the crime is direct, not circumstantial, evidence." (citation and punctuation omitted)). See also *Harper v. State*, 298 Ga. 158, 161 (780 SE2d 308) (2015) ("[D]irect evidence is not converted into circumstantial evidence by a witness's credibility or lack thereof, and the weight and reliability of such evidence is for the jury's resolution." (citations omitted)). Although Cortez and Wallace said they did not see Pindling shoot, their testimony and statements nonetheless served as direct evidence of Pindling's

20

involvement in the planning of the crimes, his presence at the scene, his possession of a gun during the robbery, and his involvement in covering up the crimes, and thus his guilt of the crimes charged at least as a party to the crimes. See OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."). Because there was direct evidence of Pindling's guilt, Pindling's argument under OCGA § 24-14-6 fails.

*Judgment affirmed. All the Justices concur.*