NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 24, 2025

S25A0077.  BOWDERY v. THE STATE.

BETHEL, Justice.

A jury found Ryan Bowdery, Rashad Barber, and David Wallace guilty of murder, aggravated assault, and related crimes in connection with the shooting death of Darius Bottoms and the non-fatal shooting of Jared Robinson. We previously affirmed the convictions of Barber and Wallace.[1] See *Wallace v. State*, 320 Ga.

---

[1] The crimes occurred on June 13, 2014. In February 2015, a Fulton County grand jury jointly indicted Bowdery, Barber, and Wallace for various crimes associated with Bottoms's death. Specifically, the grand jury indicted Bowdery for participation in criminal street gang activity (Count 1), malice murder (Count 2), three counts of felony murder (Counts 3-5), two counts of aggravated assault (Counts 6-7), criminal damage to property in the first degree (Count 8), criminal damage to property in the second degree (Count 9), and one count of possession of a firearm during the commission of a felony (Count 10). Bowdery, Barber, and Wallace were tried together before a jury in December 2017, and the jury found Bowdery guilty of all counts. The trial court sentenced Bowdery to serve life in prison with the possibility of parole for malice murder (Count 2), a consecutive five-year term for second-degree

272 (907 SE2d 657) (2024); *Barber v. State*, 314 Ga. 759 (879 SE2d 428) (2022). In this appeal, Bowdery contends that the evidence corroborating the testimony of a witness who was an accomplice was not sufficient under OCGA § 24-14-8. He also contends that the trial court plainly erred in giving an incomplete instruction on accomplice corroboration and that the trial court abused its discretion when it failed to take remedial measures after Bowdery objected to the State's closing argument. As explained below, these enumerations of error fail, and, therefore, we affirm.

State's witness Kareasha Washington provided much of the evidence related to the shooting and the circumstances leading up to it. As set forth in the appeal in Barber's case, and viewed in the light most favorable to the verdict, the evidence showed the

damage to property (Count 9), and a consecutive five-year term for firearm possession (Count 10). The remaining counts merged or were vacated by operation of law.

Bowdery filed a timely motion for new trial, which he amended through new counsel. Following a hearing, the trial court entered an order denying the motion on January 17, 2024. Bowdery filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2024 and submitted for a decision on the briefs.

following:

> [I]n the days leading up to the June 13, 2014 shooting that resulted in Bottoms's death, two rival gangs were involved in an ongoing dispute related, at least in part, to the recent decision by one gang member, Kareasha Washington, to leave the "Billy Bad Asses Bloods" gang (the "Billy" gang) and join the "Neighborhood Bloods/Rolling Twenties Blood" gang (the "NHB" gang). Washington left the Billy gang because some members thought she was involved in the death of another member of the Billy gang. Barber and his co-defendants, David Wallace and Ryan Bowdery, were members of the NHB gang.

> . . . [T]he evidence showed that on June 6, 2014, a blue Acura was stolen four blocks from the area where Bottoms was shot. Although it was not established who stole the blue Acura, Washington admitted she and Wallace drove around in the stolen Acura for several days after it was taken. On June 9, 2014, a 2014, beige, four-door Hyundai Elantra belonging to James Terrell, a friend of Barber's step-father, Jasen Williams, was stolen from in front of Williams's home, where Barber lived until just a few weeks before Terrell's Hyundai was stolen. Several hours later, shots were fired into a boarding house located on Sells Avenue, an area known to be part of the territory of the Billy gang. Shots were fired at the same boarding house two nights later, on June 12, 2014, at 4:20 a.m. Police, on this occasion, were able to recover three 9mm shell casings from outside the boarding house.

> On June 12, 2014, at about 6:20 p.m., Barber, Washington, Wallace, and a fourth person drove in the stolen Acura to the Arrowhead Pawn Shop in Clayton

County. Video surveillance from the pawn shop shows Barber, Washington, and Wallace inside the pawn shop looking at guns while another shopper, Abert Moss, and her friend, Nashunta Thomas, did the same. Barber is seen on the video wearing jeans and a white tank top. The video also shows Barber, Washington, and Wallace leaving the pawn shop, followed shortly thereafter by Thomas and Moss, who had purchased a 9mm Jimenez handgun. As Thomas sat in a car in the pawn shop parking lot with the gun Moss had just purchased, Wallace stuck a different gun in Thomas's face and demanded the newly purchased 9mm handgun. Wallace then ran back to the blue Acura and fled with Barber, Washington, and the other person.

Approximately five hours later, at 11:30 p.m. on June 12, 2014, Barber's step-father, Williams, was attacked outside his home and shot multiple times. Selena Barber, Rashad Barber's mother, accompanied Williams to the hospital, but she did not tell Barber about the shooting because she was afraid of what Barber might do. She and Williams reported the shooting to the police, however, believing that it might be related to Barber's dispute with the Billy gang.

Within hours of Williams's shooting, Barber learned that Williams had been shot, and he, Wallace, Washington, and Bowdery got together. The four drove around in the blue Acura with Washington in the driver's seat, Wallace in the front passenger seat, and Bowdery and Barber, who Washington stated was carrying both a revolver and a 9mm handgun, sitting in the rear seats. According to Washington, she then made plans to meet with a friend who was a member of the Billy gang near Legacy Drive and Sells Avenue in Fulton County.

Washington, Barber, Wallace, and Bowdery arrived early at the agreed upon location, so Barber and Bowdery got out of the car. Washington and Wallace remained in the car until, a few minutes later, she heard Barber yell, "There go them Billies," and she saw Barber and Bowdery run around the corner at the intersection of Legacy Drive and Sells Avenue. Washington then heard several gunshots, causing her to get out of the car and run away. Barber and Bowdery ran back to the stolen Acura, and Wallace, who was, by now, in the driver's seat, followed Washington and told her to get in the car. As they drove away, Washington heard Barber keep saying, "That was the Billy, that was the Billy who shot up my Mama's house."

Theda Hall, who lived in a second floor apartment near the corner of Legacy Drive and Sells Avenue, stepped onto her balcony in the early morning hours of June 13, 2014, and saw who she described as two males sitting in the front seat of a vehicle parked near the corner of Legacy Drive and Sells Avenue. She saw another male standing outside the vehicle on the sidewalk, and a fourth male standing outside the vehicle in the shadows. According to Hall, the male standing near the vehicle, the one she referred to as the "shooter," had a gun and was wearing jeans and a white shirt with thin straps across the shoulders. She described the shooter as being about 25-30 years old and approximately six feet tall with a muscular build, medium to medium-dark brown skin, "a little short haircut," and possibly a mark or tattoo on his neck. Hall saw the shooter walk up to the corner of Legacy Drive and Sells Avenue while the car pulled forward, then heard some yelling, followed by several gunshots. Hall stated the person standing in the shadows also had a gun and was talking to the shooter as he stood in the

intersection.

Bottoms and Jared Robinson had been visiting a friend in an apartment near the intersection of Legacy Drive and Sells Avenue in the early morning hours of June 13, 2014. They had driven to the friend's apartment in Bottoms's new silver four-door Hyundai Elantra, a gift to Bottoms from his grandfather. At approximately 4:00 a.m. on June 13, Bottoms and Robinson left the friend's apartment and walked to Bottoms's vehicle, which they had parked down the hill from the intersection of Legacy Drive and Sells Avenue. Robinson told police that as he and Bottoms pulled out of the parking space onto Legacy Drive facing toward the top of the hill, they saw a male coming down the hill toward them, yelling, and pointing aggressively. The person coming toward them then started shooting at them at a rapid pace, ultimately striking Bottoms through the windshield with a single gunshot from a 9mm handgun. Bottoms died at the scene from a gunshot wound to the head.

Robinson was able to get away but noticed from a distance that someone was shooting from near the stop sign at the top of Legacy Drive. Seventeen shells casing were ultimately recovered from the crime scene; eleven 9mm Luger shell casings were discovered near the intersection of Legacy Drive and Sells Avenue, and another six shell casings from a different 9mm handgun were recovered from farther down the hill.

*Barber*, 314 Ga. at 760-762.

In addition, the evidence presented at trial specifically related to this appeal showed the following. A 911 call about the shooting

6

was placed at 4:15 a.m. on June 13. At trial, Washington testified, as set out above, to her movements on June 12 and 13. Additionally, she testified that early in the morning on June 13, she, Wallace, Barber, and another person drove around together in the Acura until they arrived at the intersection of Legacy Drive and Sells Avenue shortly before 4:15 a.m. There was also evidence that in an audio-recorded pretrial statement to police, a portion of which was played for the jury, and at a prior trial of the case,[2] Washington identified Bowdery as the fourth person involved in the shooting.[3]

Approximately one week after the shooting, police arrested Wallace, who was in the stolen Acura in a restaurant parking lot. After apprehending Wallace, police recovered a 9mm Jimenez handgun from the Acura; a ballistics expert determined that the gun recovered from the Acura matched shell casings recovered from the scene of the shooting but did not fire the fatal shot. The murder

---

[2] Although not entirely clear in this record, it appears that the prior trial ended in a mistrial.

[3] At trial, Washington denied that Bowdery was present or had any involvement in the shooting.

weapon, also a 9mm Jimenez handgun, was never found. Approximately three weeks after the shooting, Bowdery posted a photo on social media showing him and Barber holding guns. The photo had the notation, "Shotta Ft. Slugga We Loaded." A detective testified that the gun Bowdery was holding in the photo appeared to be a Bryco Jennings 9 or a Jimenez JA-9 type firearm, which are essentially the same gun but are made by different manufacturers.

At the time of Bowdery's arrest, he was in possession of three guns, none of which were a Jimenez JA-9 or a Bryco Jennings 9 and none of which matched any of the ballistics evidence in this case. At trial, a gang expert identified Bowdery's tattoos, some of which had the same markings as Wallace's tattoos, and the language and hand signs he used in social media posts as being consistent with his membership in a gang, and the expert concluded that Bowdery was "participating in a criminal street gang." At a custodial interview, after being given the warnings required by *Miranda*,[4] Bowdery said that he "spent the majority or a lot of his time on Cleveland Avenue,"

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

8

"admitted to having been in the blue Acura before" on more than one occasion, and denied being in a gang or having any involvement in Bottoms's murder. Bowdery's social media posts in the month before and the month after the shooting also indicated that he was frequently in the Cleveland Avenue area.

Phone records for Washington, Wallace, and Barber were admitted into evidence. The cell-site location information ("CSLI") from Washington's cell phone records showed that on the day before the shooting at about 11:00 p.m., her cell phone accessed a tower near her home. Between 2:16 a.m. and 2:44 a.m., Bowdery's and Washington's phones communicated six times. During the call that occurred at 2:44 a.m., Washington's phone was accessing a tower with a range that covered approximately half a mile of Cleveland Avenue. At 2:47 a.m., Washington made another phone call that accessed a different tower in the same general Cleveland Avenue area. By 4:00 a.m., Washington's and Wallace's phones accessed a tower about half a mile from where the shooting occurred. There was no communication between Washington's and Bowdery's phones

9

after 2:44 a.m., until their phones started exchanging text messages again at 4:45 a.m., and then exchanged 15 texts between 4:45 a.m. and 5:17 a.m. Later during the day on June 13 and continuing for several days, Washington's and Bowdery's phones communicated on a regular basis. The State's expert witness in historical cell phone record analysis opined that the cell phone records were consistent with Washington, Bowdery, Wallace, and Barber all being together at the time of the shooting.

1. Bowdery argues that the testimony of Washington, whom the parties agreed at trial was an accomplice to the murder, was not sufficiently corroborated, as required by OCGA § 24-14-8.[5] That statute provides, in pertinent part:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness[.]

Thus, where the only witness implicating the defendant is an

---

[5] Bowdery does not assert that the evidence was insufficient as a matter of constitutional due process.

accomplice, "testimony by [the] accomplice . . . must be corroborated by other evidence implicating the defendant." *Render v. State*, 320 Ga. 890, 895 (2) (912 SE2d 679) (2025) (citation and punctuation omitted). Corroborating evidence "must either directly connect the defendant with the crime or justify an inference that he is guilty, and must corroborate both the identity of the defendant and the fact of his participation in the crime." Id. at 895 (2) (citation and punctuation omitted). The corroborating evidence "need only be 'slight' and can be entirely circumstantial," *Pindling v. State*, ___ Ga. ___ (2) (913 SE2d 659) (2025), and "need not be of itself sufficient to warrant a conviction of the crime charged." *Head v. State*, 316 Ga. 406, 411 (2) (888 SE2d 473) (2023). Nor must the corroborating evidence "match[] the testimony of the accomplice in every detail." *Mitchell v. State*, 279 Ga. 158, 159 (1) (611 SE2d 15) (2005). And "[o]nce the State adduces such evidence, it is peculiarly a matter for the jury to determine whether the evidence sufficiently corroborates the accomplice's testimony and warrants a conviction." *Crawford v. State*, 294 Ga. 898, 901 (1) (757 SE2d 102) (2014) (citation and

11

punctuation omitted). The question before the Court now is "whether there was at least *slight* independent corroborating evidence to support a finding that [the defendant] committed the crimes of which he was convicted." *Pindling*, ___ Ga. at ___ (2) (emphasis in original). See also *Threatt v. State*, 293 Ga. 549, 551-552 (1) (748 SE2d 400) (2013) ("Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support the verdict.") (citation and punctuation omitted).

Here, cell-phone record evidence, evidence about Bowdery's participation in the same gang as Washington and Wallace, testimony about the gang-related motive for the shooting, and Bowdery's own statements provided at least slight corroboration of Washington's out-of-court statement identifying Bowdery as a participant in the crimes. Specifically, Bowdery told police that he lived on Cleveland Avenue and "spent the majority or a lot of his time on Cleveland Avenue," and Bowdery's social media posts confirmed that he was in the Cleveland Avenue area in the weeks

before and after the crimes. Additionally, he admitted to police that he had ridden several times in the car that Washington said she drove to the location of the shooting. Additionally, the phone records showed that between 2:16 a.m. and 2:44 a.m. on June 13, communications were exchanged six times between Bowdery's and Washington's phones. CSLI placed Washington's phone in the Cleveland Avenue area from 2:44 a.m. to 2:47 a.m., at which time, communications between Bowdery's and Washington's phones ceased. Between 2:44 a.m. and 4:45 a.m., no communications were exchanged between Bowdery's and Washington's phones, though Washington continued using her phone to communicate with others. CSLI placed both Washington's and Wallace's phones in the vicinity of the crime scene shortly before 4:00 a.m., and investigators pinpointed the timing of the crimes based on a 911 call, which was received at 4:15 a.m. And communications between Washington's and Bowdery's phones resumed at 4:45 a.m. — 30 minutes after the shooting.

Though circumstantial, this evidence authorized the properly

13

charged jury[6] to infer that Bowdery participated with Washington in planning the crimes; that, on the night of the crimes, Washington traveled to Bowdery's home to pick him up before the shootings; and that Bowdery was with Washington and the other co-defendants during the crimes.[7] See *Crawford*, 294 Ga. at 901-902 (1) (accomplice's testimony sufficiently corroborated where cell phone records showed that appellant and accomplice communicated multiple times on day of crimes and that accomplice went to appellant's home before the crimes and traveled back to appellant's home after the crimes). See also *Threatt*, 293 Ga. at 551-552 (1) (rejecting argument that accomplice's testimony was insufficiently corroborated because, in addition to other corroborating evidence, phone records showed that appellant and accomplice were in contact before the crimes and in the hours afterward).

---

[6] As set forth in Division 2, the jury was properly instructed about the requirement for corroboration of an accomplice's testimony and that the sufficiency of the corroborating evidence was a matter solely for the jury's determination.

[7] The State addressed the accomplice-corroboration issue and advanced this exact theory during closing argument, and the jury was subsequently charged on the corroboration requirement.

Additional corroboration is found in evidence that the crimes were gang-related and that Bowdery attempted to distance himself from the gang and co-defendant Wallace by making false statements to police. See *Veal v. State*, 298 Ga. 691, 694-695 (2) (784 SE2d 403) (2016) (sufficient corroborating evidence included evidence that co-defendants were members of the same gang), overruled on other grounds, *Holmes v. State*, 311 Ga. 698, 705 (3) (859 SE2d 475) (2021); *Threatt*, 293 Ga. at 551-552 (1) (accomplice's testimony corroborated in part by appellant's "demonstrably false" statements to police); *Floyd v. State,* 272 Ga. 65, 66 (1) (525 SE2d 683) (2000) (defendant's own statement can be used to corroborate an accomplice's testimony against him). Cf. *Kim v. State*, 309 Ga. 612, 617 (1) (847 SE2d 546) (2020) ("[T]he [factfinder] could reasonably infer that [appellant] lied to the police because he shared a common criminal intent with his associate and that the two acted in concert in committing the crimes."). And here, "[a]lthough taken individually, each of the pieces of evidence do not corroborate every detail of [the accomplice's] testimony, taken together, the evidence sufficiently

15

supports [the accomplice's] testimony because only slight evidence of corroboration is required." *Head*, 316 Ga. at 415-416 (2) (b) (citation and punctuation omitted).

As such, the requirements of OCGA § 24-14-8 were met, and this claim fails.

2. Bowdery asserts that the trial court committed plain error in failing to instruct the jury on its duty to determine whether Washington was an accomplice. Again, we disagree.

The trial court charged the jury that while generally the testimony of a single witness, if believed, is sufficient to establish a fact, there is an exception where the witness is an accomplice. The trial court also instructed the jury on the principle set out in OCGA § 24-14-8 — where the only witness implicating the defendant is an accomplice, the accomplice's testimony must be corroborated by other evidence implicating the defendant. And the trial court charged that the "sufficiency of the supporting evidence of an accomplice is a matter solely for you to determine." However, the trial court did not include the last sentence of the pattern jury

charge on accomplice corroboration: "Whether or not any witness in this case was an accomplice is a question for you to determine from the evidence in this case." Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.31.92. Bowdery contends that the trial court plainly erred in omitting this portion of the pattern jury charge.

To prevail on plain-error review, an appellant must show that the alleged instructional error "was not affirmatively waived; was clear and obvious, rather than subject to reasonable dispute; likely affected the outcome of the trial; and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Clark v. State*, 315 Ga. 423, 440 (4) (883 SE2d 317) (2023) (citation and punctuation omitted). "If one prong of the plain error test is not satisfied, we need not address the other prongs of the test." *Baker v. State*, 319 Ga. 456, 462 (2) (902 SE2d 645) (2024). "Satisfying this high standard is difficult, as it should be." Id. (citation and punctuation omitted). To that end, it is not enough in the plain-error context for an appellant to demonstrate that a trial court committed "actual legal error" in charging the jury; rather, "the jury instruction

17

in question must have an obvious defect rather than a merely arguable defect." *Smith v. State*, 301 Ga. 79, 81 (3) (799 SE2d 762) (2017) (citation and punctuation omitted). This means that, to show clear and obvious error, an appellant must cite to controlling authority or to the "unequivocally clear words of a statute or rule" that plainly establish that the trial court erred. *Stewart v. State*, 311 Ga. 471, 476 (1) (b) (858 SE2d 456) (2021) (citation and punctuation omitted).

However, Bowdery does not cite, and we have not found, any case in which we have held that a trial court must include an instruction requiring the jury to determine if a witness is an accomplice when no one disputed that the witness was an accomplice. And we note, as referenced above, that Washington was never characterized by the State as anything other than an accomplice. Accordingly, this claim fails. See *Hill v. State*, 321 Ga. 177,184 (2) (913 SE2d 547) (2025) (holding that the appellant failed to show plain error from the trial court's failure to include certain language in a jury instruction when no case held that such language

18

was required, even though cases did suggest such language was recommended); *Stripling v. State*, 304 Ga. 131, 136 (2) (816 SE2d 663) (2018) (holding that the appellant failed to show plain error from the trial court's failure to give an accomplice corroboration instruction where the defendant cited no precedent requiring such an instruction under similar circumstances).

3. Bowdery asserts that the trial court erred by failing to rebuke the prosecutor, give a curative instruction, or grant a mistrial after trial counsel objected to the prosecutor's "future dangerousness" argument during closing arguments. See OCGA § 17-8-75 ("Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender."). See also *Sterling v. State*, 267 Ga. 209, 210 (2) (477 SE2d 807) (1996) (holding

19

that it is improper for a prosecutor to argue to the jury during the guilt-innocence phase that a defendant poses a threat of future dangerousness.).[8]

Shortly after beginning the State's closing argument, the prosecutor stated:

> And I have to tell you that back in June of 2014 there was trouble in the streets of our community. And I know just by looking at some of your faces that when you see the news sometimes and you see the reports of what's happening in our community you kind of shake your head and say what in the world is going on. You guys have had a chance to kind of see up close and personal what is happening.
>
> Now I'm going to tell you right now as the jury you have tremendous power. . . . [T]he bonds that you have formed together, don't let them go. You have the power of the pen. We will have a new change in administration at the first of the year. Y'all are to write a letter. You ought to say something to somebody who can do something about the things that we have heard that go on when the lights go down in our community. Because it's just ridiculous, outrageous.
>
> This thing was just about retaliation. These Defendant[s] are just ruthless. They are reckless and they are extremely, extremely dangerous.

---

[8] *Sterling* overruled prior cases in which we held that an argument regarding future dangerousness was not improper, noting that those cases involved the punishment stage of death penalty cases.

Wallace's trial counsel objected, stating that the argument is "getting really close to a future dangerous argument" and that the prosecutor was "not arguing facts in evidence." He moved for a mistrial, and Bowdery's counsel joined the objection. The trial court summarily denied the motion for mistrial and instructed the prosecutor to "move on."

We discern no abuse of the trial court's discretion. In these comments, the prosecutor did not assert that Bowdery and the co-defendants presented a danger to the community if the jury did not return guilty verdicts.[9] Rather, the prosecutor's argument, considered in context, focused on urging the jury to send a message for the safety of the community: "[A]s the jury you have tremendous power. . . . You ought to say something to somebody who can do something about the things that we have heard that go on when the lights go down in our community. Because it's just ridiculous,

---

[9] As in *King v. State*, "[w]e express no view about whether an argument about future dangerousness would be undermined by recent legal developments." 316 Ga. 611, 624 (5) (c) n.10 (889 SE2d 851) (2023).

21

outrageous." We have held that similar arguments fall within the bounds of permissible argument. See, e.g., *Arnold v. State*, 309 Ga. 573, 579 (2) (c) (847 SE2d 358) (2020) ("It is not improper for a prosecutor to argue that a jury should send a message to the community by convicting a defendant."); *Faust v. State*, 302 Ga. 211, 220 (4) (c) (805 SE2d 826) (2017) (holding that it is appropriate "for the prosecutor to urge the jury to convict for the safety of the community or to curb an epidemic of violence in the community"). Thus, because the statements were not impermissible, the trial court did not abuse its discretion in declining to rebuke the prosecutor, give a curative instruction, or declare a mistrial. Accordingly, this claim fails.

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Ellington, McMillian, LaGrua, Colvin, and Pinson, JJ, concur.*