NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 21, 2025

S25A0736. REID v. THE STATE.

ELLINGTON, Justice.

Isaac Reid appeals his convictions for malice murder and other crimes in connection with the shooting death of Wildarius Draggs.[1]

---

[1] The crimes occurred on March 15, 2022. On June 8, 2022, a Spalding County grand jury returned an indictment charging Reid, Cameron Barkley, Kinesa Harvey, and DeQuivon McMullin with malice murder (Count 1); felony murder (Counts 2 and 4), aggravated battery (Count 3); aggravated assault (Counts 5-6, for assaulting both Draggs and Rayshon Goodrum); and violations of the Street Gang Terrorism and Prevention Act (Counts 7-9). Reid, Harvey, and McMullin were jointly tried for the crimes. Barkley testified against his co-defendants at trial in the hope of obtaining leniency from the State. Following a jury trial that ran from September 18 to September 23, 2023, the jury found Reid not guilty of Count 8 but guilty of the remaining counts. Harvey was found not guilty on all counts. McMullin was found guilty of the aggravated battery of Draggs and of felony murder predicated on that aggravated battery but was acquitted of the remaining counts. McMullin's case is not a part of this appeal. On September 25, 2023, the trial court sentenced Reid to life in prison without the possibility of parole for malice murder (Count 1); to 20 years in prison for the aggravated assault of Goodrum (Count 6), to run consecutively to Count 1; and to 20 years in prison for a gang-act violation (Count 7), to run consecutively to Count 6. The felony murder counts (Counts 2 and 4) were vacated by operation of law, and the remaining counts merged for sentencing purposes (Counts 3, 5, and 9).

On appeal, Reid contends that the trial court erred by denying his motion for new trial on the general grounds. He also contends that the evidence was not legally sufficient to support his conviction under federal due process standards and that the evidence failed to satisfy the accomplice-corroboration requirement of OCGA § 24-14-8. For the reasons that follow, we reject these claims and affirm Reid's convictions.

1. The evidence presented at trial included a surveillance video from a local school building, which showed that, at approximately 5:19 p.m. on March 15, 2022, Rayshon Goodrum arrived at 1001 Lake Avenue in Griffin, Georgia, where Draggs lived with his aunt, Monica Fambro. After Goodrum arrived at Fambro's house, he and Draggs sat on the front porch of the home. Fambro's home was located on the corner of North 16th Street and Lake Avenue, with

_____

Reid filed a timely motion for new trial on October 3, 2023, and then filed an amended motion for new trial through new appellate counsel on September 3, 2024. Following a hearing, the trial court denied the amended motion for new trial on November 6, 2024. Reid filed a timely notice of appeal to the Court of Appeals, which transferred the case to this Court on February 11, 2025. The case was docketed to this Court's April 2025 term and submitted for a decision on the briefs.

2

the front porch facing Lake Avenue and one side of the house facing North 16th Street, and the neighborhood is part of "Lit Block," an area controlled by the Bloods Rollin' 20s gang, also known as the "Zoo Krew."

The surveillance video showed that, at approximately 5:29 p.m., about ten minutes after Goodrum arrived at Fambro's house, a white Ford Fusion, which belonged to DeQuivon McMullin's mother, drove down North 16th Street toward its intersection with Lake Avenue. With the front passenger window down, the car "slow rolled" through the intersection and "slowly passed" Fambro's house in front of the porch where Draggs and Goodrum were sitting. The car was driven by Kinesa Harvey, and Reid (Harvey's brother) was in the front passenger seat, while McMullin and Cameron Barkley were in the rear passenger seat. Barkley testified that he, Reid, and McMullin were members of the Zoo Krew, but Harvey was not.[2]

During the car ride, Reid showed a gold Glock 19 handgun to

---

[2] In the order denying Reid's motion for new trial, the trial court noted that, after Reid's trial, Barkley pled guilty to aggravated assault and gang activity and was sentenced "twenty years serve one."

3

Barkley and McMullin. The surveillance video shows that, at 5:44 p.m., the Ford Fusion was again driving north on North 16th Street toward its intersection with Lake Avenue, but stopped in front of a house on North 16th Street that was several houses before the intersection. Three people exited the car at that house. Barkley testified that he, Reid, and McMullin were the three who exited the car, and a law enforcement official also identified the three people from surveillance video as Reid, McMullin, and Barkley. The house on North 16th Street was a popular spot for neighborhood teenagers to buy snacks after school and for gang members to gather.

A path ran from the backyard of the house on North 16th Street to 1010 Lake Avenue, which was down the block and on the opposite side of the street from Fambro's house. Reid, McQuivon, and Barkley stood on the front porch of the house on North 16th Street for about a minute before moving to the side of the house towards the path, at which point they disappeared from the video camera's view toward the backyard. Barkley testified that once they were on the path behind the house, Reid offered the gun to both Barkley and

4

McMullin. When both refused to take it, Reid continued down the path alone, and Barkley saw Reid fire shots toward Draggs and Goodrum from 1010 Lake Avenue. Reid was gone about thirty seconds, and the group ran after the shooting. At 5:53 p.m., Reid, McMullin, and Barkley reappeared on camera at the house on North 16th Street and then walked away together, heading south on North 16th Street away from Lake Avenue. The surveillance camera at the school building did not capture any part of the shooting.

Barkley testified that he, Reid, and McMullin thought that there was an "opp," a member of an opposing gang, on the porch of the house and that was the reason Reid fired shots at the porch. Law enforcement officials found six shell casings along the side of the house at 1010 Lake Avenue, but because no handgun was ever located, the casings were not sent for any kind of forensic testing. The State, however, did introduce into evidence a photograph of members of the Zoo Krew holding a gold gun, and Barkley testified that members of the gang shared guns and that the gold gun in the photograph was the gun that Reid had on the day of the crimes.

At 5:50 p.m., shortly before the shooting, Fambro arrived home from work. She walked by Draggs and Goodrum on the porch, "came in the house, went towards the kitchen, and then … just heard six shots;" Draggs and Goodrum then ran inside. Draggs stated "I've been hit," and Goodrum hid in Fambro's pantry. Fambro called 911 at 5:54 p.m. and police officers began arriving on the scene a few minutes later. Draggs told the first officer who arrived that he had been shot by a stray bullet and did not see who shot him. Draggs later died from a single gunshot wound that penetrated both of his lungs and his heart.

A law enforcement officer testified that he thought that the shooting occurred at 5:52 p.m., as, according to his review of the surveillance footage, a bird, which had not reacted to cars driving by Fambro's house, flew away from her house at that time. However, when asked on cross whether it was possible that the bird just decided that it was going to fly away at that time and that the shooting occurred after the bird flew away, the officer said that was "plausible."

In an interview with law enforcement officials on the day of the crimes, Reid admitted that he was dropped off at the house on North 16th Street on the day of the crimes. He also said that he heard the gunshots and thought that someone might be shooting at him. The evidence at trial also showed that on March 17, Reid sent Harvey a screen shot of a newspaper article about the shooting of Draggs.

The State's gang expert testified that he knew that Goodrum lived in an area of Griffin known to be "Crip territory" and that he saw Goodrum there "constantly." He could not, however, "say that he is a Crip." The expert was not familiar with Draggs and did not know whether he had any kind of gang affiliation. The expert explained that the Zoo Krew referred to a member of a rival gang as an "opp, short for opposition." Under Zoo Krew rules, "no Crips [are] allowed on their turf," and if a Zoo Krew member saw a Crip in their territory, the member "would have to act upon that." Moreover, a Zoo Krew member could gain respect and rank in the gang by committing acts of violence against rival gang members. Further, failure to assault a rival gang member found in Zoo Krew territory

could result in discipline from gang leadership. The expert added that based on his investigation of Reid, McMullin, and Barkley, including the language and hand signs they used in social media posts and the clothes they wore, they were members of the Zoo Krew.

2. Reid contends that the evidence was insufficient to support his convictions under federal due process standards. See *Jackson v. Virginia*, 443 US 307 (1979). We disagree.

When evaluating the sufficiency of the evidence as a matter of constitutional due process, we view the evidence presented at trial in the light most favorable to the verdicts and consider whether it was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson*, 443 US at 319; *Moore v. State*, 311 Ga. 506, 508 (2021). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Wilson v. State*, 320 Ga. 766, 768 (2025) (citation and quotation marks omitted).

Reid argues that the evidence was not sufficient as a matter of constitutional due process because it showed only that he was present, along with Barkley and McMullin, at the house on North 16th Street at the time of the shooting and failed to show that he fired the shots from 1010 Lake Avenue.[3] In support of this contention, he points to the State's failure to present certain types of evidence, such as evidence that, while riding in Harvey's car on the day of the crimes, the co-defendants discussed plans to commit the crimes; evidence that, after the crimes, the co-defendants sent text messages or had other communications discussing the shooting; or evidence of a murder weapon tying Reid to the shell casings found at 1010 Lake Avenue. "However, the fact that the State did not produce certain types of evidence does not mean that the evidence was insufficient." *Jones v. State*, 319 Ga. 758, 761 (2024) (citation

---

[3] Because we no longer automatically review sua sponte the sufficiency of the evidence, except that of murder convictions resulting in the death penalty, we will not "consider[ ] all conceivable sufficiency-related issues." *Scoggins v. State*, 317 Ga. 832, 837 n.6 (2023). Instead, we limit our consideration to the argument that Reid "actually makes in challenging the sufficiency of the evidence." Id.

9

and quotation marks omitted). "Although the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." Id. at 761-62 (citation and quotation marks omitted).

Moreover, Reid challenges his convictions on the ground that Barkley was not a credible witness because he was a co-defendant and accomplice in this case. However, in conducting a sufficiency review as a matter of constitutional due process, "we do not evaluate witness credibility," but instead leave that undertaking "to the sole discretion of the jury." *Garcia-Solis v. State*, 320 Ga. 754, 760 (2025) (citation and quotation marks omitted). Accord *Rouse v. State*, ___ Ga. ___ (2025), S25A0959, slip op. at 13 (Ga. Aug. 12, 2025) (rejecting a defendant's challenge to his conviction on the basis that accomplice testimony was not credible "because the determination of whether witness testimony is … credible is one left for the jury and not considered by this Court on review").

Similarly, Reid asserts that there was conflicting evidence regarding the time the shots were fired, either at 5:52 p.m. or 5:53

10

p.m., that the weight of the evidence showed that the shots were fired at 5:53 p.m., and that the firing of the shots at that time would not have permitted Reid to fire shots from 1010 Lake Avenue and then reemerge from behind the house on North 16th Street shortly thereafter. However, based on the evidence highlighted by Reid, as well as other evidence in the case, such as evidence that Fambro arrived home at 5:50 p.m., heard the shots shortly after entering her home, and called 911 at 5:54 p.m., it was for the jury to determine when the shots were fired toward the victims and whether Reid would have had time to fire those shots at that time and reemerge at the house on North 16th Street shortly after 5:53 p.m. See *Guyton v. State*, 321 Ga. 57, 59 (2025) (explaining that in reviewing the sufficiency of the evidence to support a conviction, this Court "leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts" (citation and quotation marks omitted)).

Reid also argues that the State failed to prove that Goodrum

11

was a member of the Crips gang and that the State's theory of the case—that Goodrum was targeted because he was a member of the Crips gang in Zoo Krew territory—is therefore not supported by the evidence. As Reid correctly notes, the State's gang expert testified that he was not positive that Goodrum was a member of the Crips gang. However, he testified that Goodrum lived in Crips territory, and the expert "constantly" saw him there. Moreover, to support its theory that the motive for the shooting was gang related, the State was not required to prove that Goodrum was a member of the Crips gang, just that Reid thought that he was, and here, Barkley testified that Reid shot at Goodrum because the teenagers thought that there was an "opp," a member of an opposing gang, on the porch of Fambro's house.

Leaving the foregoing issues of evidentiary conflict, weight, and credibility to the jury, we conclude that, when viewed in the light most favorable to the verdicts, the evidence was sufficient as a matter of constitutional due process to show that Reid was not merely present at the house on North 16th Street at the time of the

shooting. See *Guyton*, 321 Ga. at 59. Here, the evidence at trial, including surveillance footage, showed that Reid, Barkley, and McMullin "slow rolled" by Fambro's home in Harvey's car when Draggs and Goodrum were sitting on the front porch. The footage also showed that a short time later, the group was dropped off in front of the house on North 16th Street, walked behind the house, was out of sight of the surveillance footage during the approximate time of the shooting, and then reemerged shortly after the shooting. Barkley testified that they believed Goodrum to be a rival in their territory, that Reid was armed, that Reid fired shots from 1010 Lake Avenue towards 1001 Lake Avenue where Goodrum and Draggs were sitting on the porch, and that the three then ran back to the house on North 16th Street. This evidence, construed in the light most favorable to the verdicts, was sufficient for the jury to find that Reid fired the fatal shot from 1010 Lake Avenue and thus to conclude that Reid "was more than merely present" during the crimes. *Boone v. State*, 321 Ga. 820, 826 (2025) (citation and quotation marks omitted).

13

For the foregoing reasons, we reject Reid's constitutional due process challenges to his convictions.

3. Reid contends that the State failed to corroborate Barkley's testimony and thus failed to satisfy the statutory accomplice-corroboration requirement. See OCGA § 24-14-8.

Under OCGA § 24-14-8, the testimony of an accomplice in felony cases "must be corroborated by other evidence implicating the defendant." *McGarity v. State*, 308 Ga. 417, 420 (2020). The corroborating evidence must be "independent of" the accomplice's testimony and must "directly connect[ ] [the defendant] to the crime or lead[ ] to the inference of guilt." *Pindling v. State*, 321 Ga. 231, 237 (2025) (citation and quotation marks omitted). "The independent corroborating evidence need only be 'slight' and can be entirely circumstantial." Id. (citation omitted).

Here, there was evidence independent of Barkley's testimony leading to the inference that Reid was guilty of the crimes. That evidence included a photograph showing members of the Zoo Krew holding a gold gun; Reid's statement that he was dropped off at the

14

house on North 16th Street before the shooting; and surveillance footage that showed that Harvey's car drove slowly in front of the porch on which the victims were sitting. A law enforcement official identified Reid, McMullin, and Barkley from the surveillance footage as the three people who were dropped off from Harvey's car at the house on North 16th Street a few minutes before the shooting. In addition, the surveillance footage shows that the three then walked behind the house, where there was a path that led to the location from which the shots were fired, and that they reemerged shortly after the shooting by the house on North 16th Street. Moreover, the gang expert testified, independently of Barkley, that Reid, Barkley, and McMullin were members of the Zoo Krew and that the gang encouraged retaliation against members of other gangs who were in its territory. In sum, taken together, the evidence corroborating Barkley's testimony was sufficient to satisfy the requirements of OCGA § 24-14-8. See *Washington v. State*, 320 Ga. 839, 845 (2025) (concluding that an accomplice's testimony was adequately corroborated by, among other evidence, surveillance

footage that showed the movements of the defendant to which the accomplice had testified); *Veal v. State*, 298 Ga. 691, 694-695 (2016) (rejecting argument that accomplice's testimony was not sufficiently corroborated based, in part, on evidence that co-defendants were members of the same gang), overruled on other grounds by *Holmes v. State*, 311 Ga. 698, 705 (2021); *Head v. State*, 316 Ga. 406, 411, (explaining that corroborating evidence "may be circumstantial, slight, and need not be of itself sufficient to warrant a conviction of the crime charged").

4. Reid argues that the trial court, sitting as the thirteenth juror, should have exercised its discretion to grant him a new trial. See OCGA §§ 5-5-20 and 5-5-21. However, "[o]n appeal from the denial of a motion under th[ese] Code Section[s], this Court reviews whether the trial court exercised its discretion as the thirteenth juror, but the decision to grant a new trial on the general grounds is vested solely in the trial court and is not subject to our review." *Tucker v. State*, ___ Ga. ___ (2025), S25A0556, slip op. at 8-9 (Ga. Sept. 16, 2025) (citation and quotation marks omitted). Here, the

record clearly shows that the trial court properly performed its duty as the thirteenth juror in denying Reid's motion for new trial, and that decision is not subject to further review by this Court. Id.

*Judgment affirmed. All the Justices concur.*