**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: April 21, 2026

S26A0306. LARKINS v. THE STATE.

LAGRUA, Justice.

Appellant Matthew Larkins appeals his convictions for malice murder and other crimes related to the shooting death of Shanna Smith.[1] On appeal, Larkins argues that his convictions should be

---

[1] Smith was shot and killed on August 4, 2016. On December 28, 2018, a Fulton County grand jury indicted Larkins, Dejon Fuller, Richard Ash, Travon Mack, and Darien Sherry for the following counts: participation in criminal street gang activity (Count 1); malice murder (Count 2); felony murder predicated on aggravated assault with a deadly weapon (Count 3); felony murder predicated on criminal damage to property (Count 4); felony murder predicated on participation in criminal street gang activity (Count 5); felony murder predicated on possession of a firearm by a convicted felon—as to Ash (Count 6); felony murder predicated on possession of a firearm by a first offender probationer—as to Fuller (Count 7); felony murder predicated on possession of a firearm by a convicted felon—as to Larkins (Count 8); felony murder predicated on possession of a firearm by a convicted felon—as to Mack (Count 9); aggravated assault with a deadly weapon (Count 10); criminal damage to property (Count 11); two counts of possession of a firearm during the commission of a felony (Counts 12 and 13); possession of a firearm by a convicted felon—as to Ash (Count 14); possession of a firearm by a first offender probationer—as to Fuller (Count 15); possession of a firearm by a convicted felon—as to Larkins (Count 16); and possession of a firearm by a convicted felon—as to Mack (Count 17).

Fuller pleaded guilty to a reduced charge of voluntary manslaughter and

reversed based on the following contentions: (1) the evidence was insufficient to support the convictions in this case because the State failed to adequately corroborate the testimony of accomplice Dejon Fuller; (2) the trial court committed plain error when it gave a misleading jury instruction on the use of a testifying co-defendant's out-of-court statements and trial testimony; (3) Larkins's trial counsel was constitutionally ineffective for failing to object when the trial court improperly commented on the evidence presented at trial; (4) the trial court erred when it admitted hearsay statements under

testified for the State at trial. Before trial, Sherry's case was severed, and Count 1 (participation in criminal street gang activity) and Count 5 (felony murder predicated on participation in criminal street gang activity) were bifurcated. Larkins, Ash, and Mack were then jointly tried on the remaining counts from October 15 to October 23, 2019. Larkins was found guilty on all counts against him that were not bifurcated for trial (i.e., Counts 2, 3, 4, 8, 10, 11, 12, 13, and 16). The jury also found Mack guilty on all such counts, but his case is not part of this appeal. The jury was unable to reach a verdict on the charges against Ash. The State moved to nolle pross Counts 1 and 5 against Larkins and Mack, and the trial court granted the request without objection. The trial court sentenced Larkins to life in prison on the malice murder count (Count 2), plus a total of 25 consecutive years to serve on Counts 11, 12, 13, and 16. The remaining counts merged or were vacated by operation of law. Larkins filed a timely motion for new trial, which he later amended through new counsel on January 13, 2021. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on December 20, 2024. Larkins filed a timely notice of appeal on January 11, 2025. This case was docketed in this Court to the term beginning in December 2025 and was orally argued on February 3, 2026.

the co-conspirator exception; and (5) Georgia case law permitting prosecutors to make a non-substantive initial closing argument is wrongly decided and must be corrected, as it is prejudicial to defendants. For the reasons that follow, we affirm.

The evidence presented at trial showed that, around 5:30 a.m. on August 4, 2016, Smith was shot and killed inside her vehicle as she drove away from a co-worker's house on Hadlock Street in Fulton County. According to that co-worker, Dejuanzell Banks, Smith gave Banks a ride home after their overnight shift ended at 4:30 a.m. When Smith and Banks arrived at Banks's house, they sat in her car—a dark green BMW sedan—for a few minutes, and Banks saw two cars make a "weird crazy turn" onto Hadlock Street from Leslie Avenue—an adjoining street—"following each other kind of fast." Banks testified that the "car in the front" was a red, four-door "sedan, maybe an Impala." Banks soon exited Smith's car and watched her drive away, "going towards Leslie." As Banks turned and entered his house, he heard multiple gunshots nearby—what sounded "like a whole clip." Worried that Smith could have been

3

struck, Banks tried numerous times to reach Smith on her cell phone, but he got no response. Banks then called 911.

Several of Banks's neighbors also heard gunshots around 5:30 a.m. on August 4 and called 911. One neighbor testified that she looked out the window and saw two people running from Hadlock Street to Leslie Avenue, one of whom was holding a "large" handgun, shooting at a car driving down Hadlock Street towards Leslie Avenue. She then saw the car swerve "down the embankment behind [her] house" on Leslie Avenue. Another witness, Gerald Slaughter, testified that, after hearing "gunfire," he saw two cars following a BMW—a "red four-door Chevy Impala" and a "brown kind of light beige color square Benz"—and then saw at least three individuals "g[e]t out of the cars," "walk[] down to" the BMW, and "start[] to unload" their weapons in the direction of the BMW. After the shooting, Slaughter saw the shooters get back into the Impala and the "Benz" and noted that one of them had "dreads."[2]

---

[2] The record reflects that Larkins wore his hair in dreads around the time of this incident.

4

An Atlanta Police Department officer responded to the scene and discovered Smith's BMW in a ditch, with multiple "bullet holes in the back windshield," and Smith in the driver's seat, with multiple gunshot wounds. Smith was transported to the hospital, where she was "pronounced deceased." The medical examiner testified that Smith died from a gunshot wound to the back of her head, which exited through her left temple.

Officers also collected numerous shell casings, including three 9mm shell casings from the same firearm, one .25-caliber shell casing, eight .45-caliber shell casings from the same firearm, five .380-caliber shell casings from the same firearm, eighteen .223-caliber shell casings from the same firearm, and seven .223-caliber shell casings from the same firearm. Officers also located a "black flip phone." Atlanta Police Detective Summer Benton, the lead detective in this case, testified that she called the phone number appearing most frequently in the call history. Karemnescia Jones answered Detective Benton's call, and based on that phone call, Detective Benton established that the cell phone belonged to Fuller,

5

one of Larkins's co-defendants. Detective Benton obtained a search warrant for Fuller's cell phone and phone records, and during her review of the corresponding cell phone records, she developed "[m]ultiple numbers of interest"—phone numbers called by Fuller's cell phone "numerous times both before and immediately after the homicide … back-to-back-to-back." Detective Benton then secured search warrants to obtain the cell phone records for those phone numbers.

Detective Benton determined that one of the cell phone numbers communicating with Fuller's cell phone during the pertinent timeframe had a subscriber name of "Quicksand" with an associated address of 7265 Ginger Court in Riverdale. Evidence was presented that, a few hours prior to Smith's shooting, Cortez Thompson was shot and injured at 7265 Ginger Court, which was later determined to be Larkins's residence.[3]

---

[3] A Clayton County police officer testified that he was dispatched to 7265 Ginger Court on the night of August 3, 2016, to investigate Thompson's shooting, and another police officer testified that he was dispatched to the hospital around 9:00 p.m. that night to question Thompson about the shooting.

Atlanta Police Detective David Quinn, who assisted Detective Benton in investigating this case, testified that the investigation of Smith's shooting went "cold" for several months. During that timeframe, Detective Quinn tried to reach Jones, Fuller's girlfriend, in an effort to locate and communicate with Fuller, but Jones would not respond to his calls or agree to meet with him. Eventually, on February 20, 2017, Detective Quinn served Jones with a grand jury subpoena for an appearance on February 21, 2017. When Jones arrived at the Fulton County Courthouse on February 21 to appear before the grand jury, Fuller accompanied her. At the time, Fuller had "an active probation warrant," so he was detained and transported to the Atlanta Police Department for an interview. Prior to interviewing Fuller, Detective Quinn advised Fuller of his *Miranda* rights,[4] which Fuller agreed to waive.

During Fuller's initial interview on February 21 and a subsequent interview on February 23, Fuller disclosed the identity of several additional suspects in Smith's shooting, including

---

[4] See *Miranda v. Arizona*, 384 US 436 (1966).

Larkins—whom Fuller referred to as "Quicksand" or "Quick"—and Larkins's co-defendants, Richard Ash and Travon Mack. During the interviews, investigators also learned that Darien Sherry, another one of Larkins's co-defendants,[5] owned a 2014 red Chevrolet Impala, which police officers later impounded and searched pursuant to a search warrant, discovering bullet holes on the exterior of the vehicle that had been covered with black duct tape. Additionally, investigators discovered a public Instagram account for "Quicksand 220," which, according to Fuller's testimony, was Larkins's Instagram profile name. In the postings on Quicksand 220's Instagram account, investigators located a screenshot of the arrest warrant issued by the Atlanta Police Department for this shooting, with brackets drawn around the following language: "A third male identified in this case is Matthew Von Larkins." Also posted to Quicksand 220's Instagram account was what appeared to be a "selfie photo" of Larkins looking into a mirror, and in this photograph, Larkins's hair was styled in long dreads.

---

[5] Sherry was not tried with Larkins, Ash, and Mack.

Fuller testified as a State's witness at trial pursuant to an agreement with the State that resulted in him pleading guilty to voluntary manslaughter and being sentenced to 20 years on probation. Fuller explained that he was neighborhood friends with Larkins, Ash, Mack, and Sherry and spent a lot of time at Larkins's house on Ginger Court. Fuller testified that, shortly after 9:00 p.m. on August 3, 2016, he found out from Sherry that Thompson, who was part of their friend group, had been shot and taken to the hospital. Fuller also learned that Thompson had been hanging out at Larkins's house with Sherry, Larkins, Mack, and some other people when the shooting occurred. According to Fuller, Sherry told him that, after the shooting, Thompson's shooter ran from Larkins's house and was picked up by a vehicle, and Larkins later discovered that the shooter had fled to an address on Hadlock Street. Around midnight on August 3, Sherry and Ash drove to that location, and when they arrived, Sherry saw the vehicle in which the shooter had fled and shot at the car but did not hit anyone. The shooter's vehicle then sped away from the area.

9

Fuller testified that he met up with Larkins, Ash, Mack, and Sherry at a mutual friend's house during the early morning hours of August 4, and the group reached a "collective agreement" to go back to the Hadlock Street neighborhood to find the shooter, agreeing that "if [they] saw some people out there," they "were going to shoot them." Fuller testified that the group traveled in tandem to the area around the intersection of Hadlock Street and Leslie Avenue, where they believed the shooter would be. Sherry drove his Impala with Mack as a passenger, and Ash drove his car—a "gold or tan" "[f]our-door sedan"—with Fuller and Larkins as passengers. Fuller testified that everyone in the group was armed. Fuller had two guns—"a Desert Eagle 44-magnum and a Taurus 40"—Sherry and Mack had a "rifle and another pistol"; and Larkins had what "looked like an assault rifle … but it shot 45 [caliber] rounds." Fuller could not recall what kind of weapon Ash had. When the group arrived in the neighborhood, they "drove around" and then parked near the corner of Leslie Avenue and Hadlock Street, remaining in their cars. Shortly thereafter, the group saw a car—a "darker in color … 4-door

10

sedan"—heading towards them, coming from the direction of the house where they believed the shooter to be. According to Fuller, he and Sherry were communicating continuously by phone, and when they saw the car heading towards them, Sherry said, "here they come, here they come." Fuller said that he, Larkins, Mack, and Sherry got out of the cars—armed—and Larkins, Mack, and Sherry started shooting. Fuller attempted to shoot, but his guns "malfunctioned." Fuller testified that he did not how many shots were fired, but it "had to be over 20." Immediately after the shooting, Fuller saw the car they had been shooting at "swerve[] off" and "c[o]me to a stop" on Leslie Avenue. The group got back into their cars, and as they drove away, Fuller saw "straight clear into the car" and observed "a female slumped over in the car."

Fuller testified that, shortly after leaving the scene, he realized he had dropped his cell phone, but he did not know when or where. Later that morning, Jones told Fuller that the Atlanta Police Department had his cell phone, and when Fuller was interviewed by detectives in February 2017, he initially claimed he had lost the

11

phone about a week prior to the shooting.

Officers determined during their investigation that Larkins went by the nickname "Quicksand," which—as noted above—was the subscriber name associated with one of the cell phones communicating with Fuller during the pertinent timeframe, and the subscriber address for that cell phone was Larkins's address on Ginger Court.

Atlanta Police Detective Kevin Leonpacher, who was tendered as an expert at trial in the field of "historical cell phone data," "cell tower analysis," and "phone data analysis," testified that he received phone records from the cellular service providers for the cell phones of Larkins, Fuller, Ash, Mack, and Sherry pursuant to a search warrant. Detective Leonpacher testified that he used those cell phone records to analyze the cell phone data for Larkins' and his co-defendants' cell phones to "plot activity" and determine the location of those cell phones during the pertinent timeframe from the evening of August 3 to the late morning hours of August 4, 2016. According to Detective Leonpacher, the "points of interest" in this

case were a location in Riverdale close to Larkins's house and an area around the intersection of Hadlock Street and Leslie Avenue. With respect to Larkins's cell phone, Detective Leonpacher determined that, based on his review of cell phone records, cell phone data, cell networks, and cell tower information, a "device associated with Larkins's phone number was showing activity in the area generally around Riverdale" at 4:58 a.m. on August 4, 2016." And, between 5:19 a.m. and 5:38 a.m. on August 4, Larkins's cell phone "was showing activity in an area also consistent with the same general geographic area that includes Hadlock Street" and Leslie Avenue. Detective Leonpacher further determined that, based upon his expert analysis of the cell phone records for Larkins's and his co-defendants' cell phones, these "five devices" "exhibited a pattern of communication with respective cell networks" that was "consistent with movement from the area of Riverdale at roughly 4:50 in the morning [on August 4] up to the area of Hadlock Street … at roughly 5:20 through 5:40."

13

1. In his first enumeration of error, Larkins contends that the evidence presented at trial was insufficient to support Larkins's convictions because the State failed to adequately corroborate the testimony of "confessed accomplice" Fuller under OCGA § 24-14-8. We disagree.

> OCGA § 24-14-8 provides, in pertinent part, that
>
> [t]he testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including … felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness.

We have interpreted this statute to mean that, "where the only witness implicating the defendant is an accomplice, testimony by the accomplice must be corroborated by other evidence implicating the defendant." *Bowdery v. State*, 321 Ga. 890, 896 (2025) (cleaned up). "Corroborating evidence must either directly connect the defendant with the crime or justify an inference that he is guilty, and must corroborate both the identity of the defendant and the fact of his participation in the crime." Id. (quotation marks omitted). And we

14

have said that "[s]ufficient corroborating evidence may be circumstantial, slight, and need not be of itself sufficient to warrant a conviction of the crime charged." *Head v. State*, 316 Ga. 406, 411 (2023). "Nor must the corroborating evidence match the testimony of the accomplice in every detail." *Bowdery*, 321 Ga. at 896 (cleaned up). "The sufficiency of corroboration is a matter for the jury to decide, and in considering sufficiency, we must consider all of the evidence that was admitted by the trial court, regardless of whether that evidence was admitted erroneously." *Head*, 316 Ga. at 411. With these principles in mind, we now consider whether sufficient corroborating evidence was presented to support a finding that Larkins "committed the crimes of which he was convicted." *Bowdery*, 321 Ga. at 896 (cleaned up).

Although the majority of the evidence implicating Larkins came from his accomplice, Fuller, multiple pieces of evidence—including cell phone evidence, ballistics evidence, and eyewitness testimony—provided at least slight corroboration of Fuller's testimony identifying Larkins as a participant in the crimes.

Here, the evidence showed that around 5:00 a.m. on August 4, 2016, a "device associated with Larkins's phone number" showed activity and "exhibited a pattern of communication with respective cell networks" "in the area generally around Riverdale." And, between 5:19 a.m. and 5:38 a.m. on August 4, Larkins's cell phone showed activity and communicated with cell networks "in an area … consistent with the same general geographic area that includes Hadlock Street" and Leslie Avenue, where Smith's shooting occurred.

In addition, ballistics evidence presented by the State corroborated Fuller's testimony regarding Larkins's involvement in the crime. Fuller testified that, on the morning of Smith's shooting, Larkins was armed with a firearm that "looked like an assault rifle … but it shot 45 [caliber] rounds." Among the ballistics evidence collected at the scene were eight .45-caliber shell casings, which the State's firearms expert determined were all fired from the same firearm. Additionally, while Slaughter—one of the eyewitnesses— could not positively identify Larkins in a photographic lineup,

16

Slaughter testified that it was dark when he witnessed the shooting, and his description of the hairstyle worn by one of the shooters was consistent with how Larkins wore his hair—i.e., in "dreads"—as demonstrated by the selfie photograph posted to Larkins's Instagram account. Finally, the jury was properly instructed on the requirement that an accomplice's testimony be corroborated, and having received this instruction, the jury was the proper arbiter of the weight afforded to this other evidence. See *Head*, 316 Ga. at 413.

Therefore, while the corroborating evidence in this case was not overwhelming and may not have individually corroborated every detail of Fuller's testimony, we conclude that, taken together, the evidence authorized the jury to conclude that the accomplice testimony was corroborated. See *Bowdery*, 321 Ga. at 898 (concluding that cell phone records and testimony about the motive for the shooting sufficiently corroborated the accomplice's testimony identifying the defendant as a participant in the crimes) (quotation marks omitted); *Head*, 316 Ga. at 415 (concluding that evidence of the defendant's communications with his co-defendants before and

17

after the crimes implicated him in the shooting and was sufficient to corroborate the accomplice testimony about the defendant's involvement in the charged crimes); *Poole v. State*, 312 Ga. 515, 521–23 (2021) (concluding that physical evidence from the crime scene, a witness's description of the shooting, and cell phone data showing the defendant and his co-defendants communicating during time span and in area of the shooting was sufficient to corroborate accomplice testimony and sufficient to support the defendants' convictions). And, though Larkins argues that this evidence "shows only that a phone associated" with him "traveled to the area where the murder occurred at the time it occurred," we conclude that there was enough evidence to corroborate Fuller's statements, and that the evidence as a whole—i.e., Fuller's testimony combined with the cell phone evidence, ballistics evidence, and eyewitness testimony— was constitutionally sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Larkins was guilty of the crimes of which he was convicted. See *Head*, 316 Ga. at 412. As such, this claim fails.

2. Larkins next contends that the trial court committed plain error by giving the jury a misleading and erroneous instruction in which the trial court advised the jury that they could only consider a testifying co-defendant's out-of-court statement against that same co-defendant. The specific jury instruction Larkins challenges on appeal is as follows:

> Any out-of-court statement made by one of the Defendants on trial in this case after the alleged criminal act has ended may be considered only against the person who made the statement and only if you find that such statement was freely and voluntarily made. *If you find that an out-of-court statement was made to the police freely and voluntarily by a Defendant on trial in this case, then you are to consider the statements only as against the particular Defendant who made it. And that would be Defendant Richard Ash in this case.* A statement that Defendant Ash allegedly made while in custody has been offered for your consideration. Before you may consider this as evidence for any purpose you must determine whether the statement was voluntary, and if the statement was given in custody, whether the Defendant was properly advised of his Constitutional Rights.... The burden of proof is upon the State to establish that Defendant Ash's statement was voluntary that is freely and willingly made. If you do not find that the statement was voluntary, you may not consider it for any purpose. If you find, however, that the statement was made while in custody and as a result of police questioning, you also must determine whether the Defendant was advised of

19

his Constitutional Rights and whether he clearly understood and knowingly gave up those rights…. The burden of proof is upon the State to establish that the warnings of all rights that I have described were given and that they were understood and knowingly given up by the Defendant. If you find, as mentioned above, that Defendant Ash's statement was voluntary and that all of the warnings as to his Constitutional Rights were given, and that he understood the meaning of what was said and knowingly gave up those rights, then you may consider the statement as evidence. If so, then you must apply the general rules for testing the believability of witnesses and decide what weight, if any, you will give to all or any part of such evidence. If you fail to find that Defendant Ash was properly informed of those rights and that he understood and gave them up, you must disregard the statement entirely and give it no consideration in reaching your verdict….

(Emphasis supplied).

At trial, the State admitted the out-of-court statement Ash made to law enforcement at the time of his arrest, in which Ash indicated he did not know "any of the facts or circumstances surrounding the charge for which he was arrested" and "didn't know anybody" involved in Smith's shooting, including Larkins and Fuller. Ash also testified on his own behalf at trial and said, among other things, that he did not know any of his co-defendants "as far

as friends," but only "through [his] little brother," and that he was not present when the shooting of Smith occurred.

On appeal, Larkins argues that the above-quoted jury instruction "is legally wrong" and "misinformed the jury that they could not use [] Ash's out-of-court statements at all to decide [Larkins's] fate," even though "this law only applies to a non-testifying co-[d]efendant" and "Ash testified at trial." Larkins further argues that, because Ash testified at trial and because "[a] prior consistent statement may be used as substantive evidence," Ash's out-of-court statement could have been used "as evidence to benefit [Larkins's] case" since that statement "included critical impeachment" of both Fuller's direct testimony and "the State's theory of the case" against Larkins, whom Ash did not inculpate in this crime. Larkins contends that, without Ash's prior consistent statement, Ash's trial testimony was weakened, thereby harming Larkins.

Larkins concedes that he did not object to the jury instructions at trial, so we review this claim only for plain error. See OCGA § 17-

21

8-58(b) (providing that the failure to timely object to an allegedly improper jury instruction "shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties").

This Court has established the following test for determining whether there is plain error in jury instructions under OCGA § 17-8-58(b):

> First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. If one prong of the plain error test is not satisfied, we need not address the other prongs of the test.

*Campbell v. State*, 320 Ga. 333, 348 (2024) (cleaned up). "Satisfying this high standard is difficult, as it should be." *Baker v. State*, 319 Ga.

22

456, 462 (2024) (quotation marks omitted). And "it is not enough in the plain-error context for an appellant to demonstrate that a trial court committed actual legal error in charging the jury; rather, the jury instruction in question must have an obvious defect rather than a merely arguable defect." *Bowdery*, 321 Ga. at 898–99 (quotation marks omitted).

We recognize that *Bruton v. United States*, 391 US 123 (1968), does not apply when a co-defendant chooses to testify at trial, so the trial court's limiting instruction in this case was incorrect. See *Henderson v. State*, 317 Ga. 66, 77 (2023) (holding that *Bruton* excludes the out-of-court statement of a non-testifying co-defendant when that statement is used to inculpate the defendant). But, here, even assuming that the trial court clearly and obviously erred in advising the jury that Ash's out-of-court statement could only be used against him, Larkins's plain-error claim fails "because he has not carried his burden of showing that the erroneous instruction actually affected his substantial rights or likely affected the outcome of his trial." *Holloway v. State*, 320 Ga. 653, 662 (2025) (quotation marks

omitted). See also *Johnson v. State*, 321 Ga. 511, 520 (2025) (concluding that, even if "the trial court made a clear or obvious error by failing to charge" the jury on the State's burden of proof, the appellant failed to demonstrate plain error because he failed to show that "any such error probably affected the outcome of the trial").

As an initial matter, even if the jury believed—based on the trial court's above-quoted instruction—that it could not use Ash's exculpatory out-of-court statement to impeach Fuller or the State's theory of the case against Larkins, nothing in the trial court's instruction prevented the jury from using Ash's *trial testimony* for that purpose. And, to that end, while the trial court may have given an erroneous instruction on the use of a testifying co-defendant's out-of-court statement, the trial court properly instructed the jury on impeachment, witness credibility, and pretrial statements by witnesses, including Ash, charging the jury that

> [t]o impeach a witness is to show that the witness is unworthy of belief. A witness may be impeached by disproving the facts to which the witness testified.... In determining the credibility of any witness whose credibility has been attacked as I have described above

24

and any testimony by that witness, you may consider, where applicable, evidence offered to support the credibility or believability of any such witness. Your assessment of a trial witness's credibility may be [a]ffected by comparing or contrasting that testimony to statements or testimony of the same witness before the trial started. It is for you alone to determine whether there's a reasonable explanation for any inconsistency in any witness's pretrial statements and testimony when compared to the same witness's trial testimony. As with all issues of witness credibility, you as the Jury must apply your common sense and reason to decide what testimony you believe or do not believe.

Additionally, after instructing the jury that the testimony of a single witness, if believed, is generally sufficient to establish a fact, the trial court also properly charged the jury regarding the need for accomplice corroboration and what constituted the requisite corroboration, charging that

[o]ne exception to the single witness rule is where the witness is an accomplice. The testimony of the accomplice alone is not sufficient to warrant a conviction. The accomplice's testimony must be supported by other evidence of some type and that evidence must be such as would lead to the inference of the guilt of the accused independent of the testimony of the accomplice. It is not required that the supporting evidence be sufficient to warrant a conviction or that the testimony of the accomplice be supported in every material particular. The supporting evidence must be more than that a crime was

25

actually committed by someone. It must be sufficient to connect the accused with a criminal act and must be more than sufficient to merely cast upon the accused a grave suspicion of guilt. Slight evidence from another source that connects the accused with the commission of the alleged crime intends to show participation in it may be sufficient supporting evidence of the testimony of an accomplice. In order to convict[,] that evidence[,] when considered with all of the other evidence in this case[,] must be sufficient to satisfy you beyond a reasonable doubt that the accused is guilty. The sufficiency of supporting evidence of an accomplice is a matter solely for you the Jury to determine. The testimony of one accomplice may be supported by the testimony of another accomplice. Whether or not the testimony of one accomplice does in fact support the testimony of another accomplice is a matter solely for you to determine.

As we have often explained, "[w]hen we are presented with a claim that a particular instruction is misleading, we do not evaluate jury charges in isolation, but rather consider them as a whole to determine whether there is a reasonable likelihood the jury improperly applied a challenged instruction." *Walker v. State*, 311 Ga. 719, 724 (2021) (cleaned up). See also *Johnson v. State*, 312 Ga. 481, 490 (2021) (explaining that, when we evaluate whether the trial court plainly erred in giving a jury instruction, we consider the jury instructions as a whole). "When viewing the instructions as a whole,"

we conclude that "any prejudice stemming from the trial court's" erroneous instruction to the jury about the use of a testifying co-defendant's out-of-court statement "was minimized by these other instructions," *Holloway*, 320 Ga. at 663, because they properly instructed the jury on the law to be applied in this case. See *Adkins v. State*, 314 Ga. 477, 483 (2022) (holding that the trial court did not plainly err by failing to instruct the jury on a requested charge because the charges as a whole demonstrated that "the concept was covered by other jury instructions"); *Johnson*, 312 Ga. at 490–91 (holding that, after considering the jury instructions as a whole, the appellant failed to show that the trial court's omission of a portion of the pattern charge amounted to plain error because the trial court's other instructions adequately instructed the jury on what the State was required to prove and the elements of the charged crimes).

Moreover, Larkins's contention that Ash's out-of-court statement would have benefited Larkins's case and strengthened Ash's trial testimony is without merit because, although some of Ash's trial testimony was consistent with his out-of-court

statement—namely, that Ash did not really know his co-defendants and was not present for the shooting—much of it was not. On direct examination at trial, Ash stated for the first time that, on the night of August 3, he was at "the weed man's house"; Fuller was also there; Fuller agreed to give Ash a ride to the store when they left the house; before reaching the store, Fuller ended up dropping off Ash somewhere in Riverdale; and Ash accidentally dropped his cell phone in Fuller's car, which Ash's little brother returned to him late the next morning. Ash also conceded on cross-examination that many of the details he testified to at trial were omitted or different from the ones he gave to law enforcement during his custodial interview, and Ash admitted that, as it pertains to Larkins, Ash had a "phone number in [his cell] phone for Quicksand" and that the "weed man's house" he visited on the night of August 3 was the house the State identified at trial as Larkins's residence. Additionally, as noted in Division 1, the other evidence against Larkins—including cell phone evidence, ballistics evidence, eyewitness testimony, and Fuller's testimony—was strong and

28

authorized the jury to conclude that Larkins was guilty of the crimes of which he was convicted. See *Head*, 316 Ga. at 412.

Accordingly, after viewing the trial court's instructions as a whole and the strong evidence of Larkins's guilt, "we cannot say that the challenged instructional error likely affected the outcome of his trial." *Priester v. State*, 316 Ga. 133, 140 (2023). See also *Jones v. State*, 302 Ga. 892, 897–98 (2018) (concluding that any error in the jury instructions was harmless, given the court's instruction as a whole and the very strong evidence of defendant's guilt).

3. In his third enumeration of error, Larkins claims that his trial counsel was constitutionally ineffective by failing to object when the trial judge, in responding to a jury question, purportedly commented on the evidence in violation of OCGA § 17-8-57(a)(1) ("It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused."). For the reasons that follow, this claim fails under the standard set forth in *Strickland v. Washington*, 466 US 668, 687 (1984).

"To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant." *Ealey v. State*, 322 Ga. 509, 522 (2025) (citing *Moss v. State*, 311 Ga. 123, 126 (2021)). "In reviewing either component of the inquiry, all factual findings by the trial court will be affirmed unless clearly erroneous." Id. (quotation marks omitted).

We have said that, "[t]o prove deficient performance, a defendant must show that his counsel performed in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Nesbit v. State*, 321 Ga. 240, 246–47 (2025).

> The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

Id. at 247 (cleaned up). And, to prove prejudice, "a defendant must establish a reasonable probability that, in the absence of counsel's

deficient performance, the result of the trial would have been different." *Ealey*, 322 Ga. at 522. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." Id. (quotation marks omitted).

The record reflects that, during deliberations, the jury presented a note to the trial court, stating: "Can we have the phone records? Can we have [G]oogle location records?" The note was signed by "Juror 44." The jurors were brought into the courtroom, and the trial court inquired first about the jurors' request for the Google location records, to which Juror 44 responded, "At this time we have what we need. We can make another request tomorrow if we need that." The following exchange then occurred:

> TRIAL JUDGE: So I'll then treat the Google record's request, the location record's requests as satisfied. You still have requested phone records, and the Court's interpretation of the note was that you wanted phone records, also the phone records –
>
> JUROR 44: For those three days.
>
> TRIAL JUDGE: For all of the Defendants?

31

JUROR 44: If that's possible, yes.

TRIAL JUDGE: All right. So that obviously is something that we'll have an opportunity to work on this evening and we will ensure those are available tomorrow morning.

Larkins's trial counsel did not object after this exchange occurred.

At the motion-for-new-trial hearing, Larkins called his trial counsel to testify, and during direct examination, Larkins's appellate counsel asked trial counsel if "there was a strategic reason not to object" when the trial court commented to the deliberating jury "that they would be receiving the telephone records for the relevant period of time … of all the defendants." Larkins's trial counsel explained that he did not interpret the trial court's question as a comment on the evidence, stating:

> [O]ur defense had always been that Mr. Larkins simply wasn't involved. Secondarily, I believe that there were phone records introduced that were perhaps attributable to Mr. Larkins. And there was testimony of a co-defendant that was the main evidence in the case against Mr. Larkins.
>
> Those phone records, whatever phone records were introduced into evidence, were part of the record. My understanding is that the jury asked to review the phone

records that were introduced. And they asked for the phone records.

And since there were separate defendants on trial, and the phone records were introduced for, I believe, all of the defendants on trial, the question from jurors was: Can we look at the phone records. And I think the Court's statement was: For everybody? And she … may have used the words, defendants. But my impression and my understanding of the Court's response was meaning for all of the people on trial or specific defendants or specific exhibits. And I think the jurors responded, for everybody.

I didn't — I didn't see that as a comment on the evidence. I don't see that as a comment on the evidence now. I did not object because I did not believe that was a comment on the evidence. That was simply a response to a request from the jurors to review the evidence already admitted in the case.

On appeal, Larkins contends that his trial counsel performed deficiently by failing to object to the trial judge's clarifying question about the cell phone records—i.e., "For all of the Defendants?"—because, while evidence was presented from which the jury could conclude that Larkins's cell phone records were tendered into evidence under the name "Quicksand," the issue of whether it was actually Larkins's cell phone was ultimately one for the jury to decide, and thus, the trial court's question was an improper

33

comment on the evidence under OCGA § 17-8-57(a)(1). Larkins further contends that his trial counsel's deficient performance prejudiced the outcome of the case because the evidence of Larkins's guilt was scant and this critical piece of evidence linked Larkins to the general area of the crime scene. Because we conclude that trial counsel's interpretation of the trial court's response to the jury and his decision not to object to that response were not "patently unreasonable" under the circumstances, *Nesbit*, 321 Ga. at 247, we see no deficiency in trial counsel's performance and need not reach prejudice. See *Ealey*, 322 Ga. at 522.

Again, in assessing an ineffective-assistance-of-counsel claim, "our inquiry is focused on the objective reasonableness of counsel's performance," *State v. Tedder*, 305 Ga. 577, 584 (2019) (cleaned up), which "is examined from counsel's perspective at the time of trial and under the particular circumstances of the case." *Nesbit*, 321 Ga. at 247. And "[d]ecisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have

followed such a course." *Clark v. State*, 321 Ga. 732, 738 (2025). Larkins also "bears the burden of showing that his trial counsel's actions were patently unreasonable," *Nesbit*, 321 Ga. at 249 (quotation marks omitted), and he has not done so here.

Larkins concedes on appeal that the State connected the "Quicksand phone number" to Larkins, and that the jury could have concluded, based on the evidence, that "[Larkins's] phone records were tendered into evidence under the name 'Quicksand.'" Given that Larkins was one of three defendants on trial in this case and that cell phone records connected to "Quicksand"—who the State established to be Larkins—were admitted into evidence at trial, we cannot say that trial counsel's interpretation of the trial court's response to the jury—i.e., as "simply a response to a request from the jurors to review the evidence already admitted in the case" that the State contended was linked to the defendants—"was so patently unreasonable" that no competent attorney in that position would have interpreted the trial court's response the same way. *Nesbit*, 321 Ga. at 247. Nor can we say that trial counsel's decision not to object

to the trial court's response on this basis was deficient. See *Copney v. State*, 322 Ga. 794, 800 (2025) (holding that, "[b]ecause a reasonable attorney in trial counsel's position could have made a strategic decision not to object," the appellant "has not met his burden of demonstrating that his trial counsel was deficient"). For these reasons, this ineffective assistance of counsel claim fails.

4. Larkins next contends that the trial court abused its discretion by admitting statements co-defendant Sherry made to Fuller about Thompson's shooting under the co-conspirator exception set forth in Rule 801(d)(2)(E). See OCGA § 24-8-801(d)(2)(E) (providing that "[a] statement by a coconspirator of a party during and in furtherance of the conspiracy" shall "not be excluded by the hearsay rule"). Larkins argues that Sherry's statements were not admissible as the statement of a co-conspirator because they were "not made during the purported conspiracy to murder the alleged victim" since "the conspiracy did not yet exist," citing *United States v. Tombrello*, 666 F2d 485, 490 (11th Cir. 1982). This contention also fails.

At trial, Fuller testified that, on the night of August 3, 2016, he learned details about Thompson's shooting from Sherry. When Fuller started to testify about what Sherry told him that night, Mack's trial counsel objected on hearsay grounds, prompting a bench conference. The State argued that the statements were admissible under OCGA § 24-8-801(d)(2)(E) as the statements of a co-conspirator during the pendency of a conspiracy. Larkins and his co-defendants argued that the statements were not admissible under OCGA § 24-8-801(d)(2)(E) because they were a "mere recitation of past events" and "not in the course and in furtherance of a conspiracy." The trial court overruled the objection and allowed the testimony to be admitted. Fuller then testified that Sherry told him Thompson had been shot inside Larkins's house on the night of August 3, and after the shooter fled and Larkins learned of the shooter's whereabouts, Sherry and others went to that location to seek out the shooter.

"To admit evidence under Rule 801(d)(2)(E), the State is required to show by a preponderance of the evidence that a

37

conspiracy existed, the conspiracy included the declarant and the defendant against whom the statement is offered, and the statement was made during the course and in furtherance of the conspiracy." *Kemp v. State*, 303 Ga. 385, 392 (2018) (quotation marks omitted). This Court applies "a liberal standard in determining whether a statement is made in furtherance of a conspiracy, and statements that further the interests of the conspiracy in some way meet this standard." *Mosley v. State*, 307 Ga. 711, 716 (2020) (quotation marks omitted).

We conclude that, here, even if Fuller's testimony relaying what Sherry said about the shooting of Thompson relied upon inadmissible hearsay because the conspiracy to retaliate against Thompson's shooter did not yet exist at the time Sherry made these statements to Fuller, "any error in admitting that testimony was harmless under the nonconstitutional harmless error standard." *Ealey*, 322 Ga. at 521 (concluding that the admission of an officer's testimony relying upon inadmissible hearsay was harmless given the other evidence of the defendant's guilt). "The test for

38

determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Kingdom v. State*, 321 Ga. 363, 369 (2025). See also *Head v. State*, 316 Ga. 406, 416 (2023) ("A trial court's error in allowing hearsay testimony is harmless if is highly probable that the alleged error did not contribute to the verdict."). And, in determining whether the error contributed to the verdict, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." *Ealey*, 322 Ga. at 521 (quotation marks omitted). "Further, the erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced." *Head*, 316 Ga. at 417 (quotation marks omitted).

Viewing the record in this way, the evidence properly admitted at Larkins's trial showed that (1) Larkins associated with and/or was friends with Thompson, Fuller, Ash, Mack, and Sherry; (2) on the night of August 3, 2016, Thompson was shot at Larkins's residence as established by the testimony of police officers who responded to the scene and to the hospital where Thompson was

being treated for his injuries; (3) Fuller met with Larkins, Ash, Mack, and Sherry during the early morning hours of August 4 and reached an agreement—of which Fuller was a part—to go to the Hadlock Street area where Thompson's shooter might be located and to shoot whoever they saw there; (4) Fuller identified Larkins as one of the shooters; (5) an eyewitness saw someone with a similar hairstyle and similar in appearance to Larkins at the scene; (6) shell casings consistent with the type of firearm Larkins carried were collected at the scene; and (7) Larkins's cell phone records and cell site location information placed Larkins's cell phone at the crime scene when Smith was murdered. Furthermore, Sherry's statements at issue were limited and largely cumulative of other evidence admitted at trial, including the testimony of the police officers who initially investigated Thompson's shooting. See *Evans v. State*, 921 SE2d 310, 315 (2025) (concluding that, any error in the admission of inadmissible hearsay was harmless where it was "cumulative of other properly admitted evidence").

Given this substantial evidence of Larkins's guilt and the fact

40

that Fuller's testimony relying on what Sherry told him prior to Smith's shooting was cumulative of other properly-admitted evidence at trial, we conclude—after "weighing this evidence as we would expect reasonable jurors to have done"—that it is highly probable that any error on the part of the trial court in admitting Fuller's testimony was harmless and did not contribute to the guilty verdicts. *Head*, 316 Ga. at 418 (cleaned up). See also *Ealey*, 322 Ga. at 521; *Kingdom*, 321 Ga. at 369 (concluding that any error in admitting a detective's testimony relying on hearsay was harmless given the other evidence pointing to the defendant's guilt). Therefore, Larkins's hearsay claim fails.

5. In his final enumeration of error, Larkins contends that the law permitting prosecutors to make a non-substantive initial closing argument is wrongly decided and that Larkins was prejudiced by the non-substantive initial closing argument made by the State in this case. Specifically, Larkins asserts that, during the State's initial closing argument, the prosecutor briefly summarized the general facts of the case, without specifically referencing Larkins, leaving

41

Larkins with nothing to rebut. And, while Larkins concedes that Georgia courts have the discretion to allow prosecutors to waive their initial closing argument, he argues that this practice undermines the fairness of trial proceedings and directly contradicts the language of OCGA § 17-8-71.[6] We see no merit to this claim.

The record reflects that, prior to closing arguments, the trial court instructed the jury as follows:

> Because the State has the burden of proof, the State has the opportunity to open and/or close at its election. What that means is that the State may use all of its time and proceed first or the State may reserve all [of] its time [and] proceed last or the State may split its time and proceed both first and last.

The State then advised the trial court that it would "open and close," and the State proceeded with its closing argument. During the initial portion of the State's closing argument, the prosecutor addressed the circumstances surrounding Smith's shooting— including what she was doing prior to her death; the lack of

---

[6] OCGA § 17-8-71 provides: "After the evidence is closed on both sides, the prosecuting attorney shall open and conclude the argument to the jury. The defendant shall be entitled to make a closing argument prior to the concluding argument of the prosecuting attorney."

eyewitnesses; the fact that Fuller's dropping of his phone led to law enforcement's awareness that Larkins and his co-defendants were potentially involved in the shooting; the charges in the indictment; the State's burden of proof; the jurors' duty in light of that burden; the meaning of "reasonable doubt"; the jury's obligations during deliberation; the guilt of "the defendants"; and the applicable law.

When the prosecutor concluded her initial closing argument, Larkins's trial counsel objected, arguing that the State did not "argu[e] the facts in closing argument." Larkins's trial counsel then stated:

> I understand that Georgia has traditionally allowed the State to waive opening, reserve closing or split the argument, however, that's not the prevailing view in any state in the Union, it's not the prevailing view in Federal Court, and since we have gone to the Federal Rules of Evidence, sooner or later we're going to come to our senses and make a -- require the State to make a full and fair opening argument so that the Defense has an opportunity to rebut. So I'd make that argument on the record.

The trial court overruled the objection.

The law concerning the State's options with respect to closing arguments—i.e., the choice to either waive opening argument or to

conduct both an opening and concluding argument as permitted by OCGA § 17-8-71—is well settled, and we see no reason to revisit our long-standing precedent in this case. See *Hyden v. State*, 308 Ga. 218, 223 (2020) (concluding that, when asked to reconsider our precedent regarding the State's ability to waive its initial closing argument, there was "no compelling reason to do so").[7] See also *Petty v. State*, 283 Ga. 268, 270 (2008) (noting that "we have long held that the trial court, in its discretion, may permit a waiver of the initial closing argument"). Moreover, in this case, the State elected to open and conclude, and despite Larkins's argument to the contrary, the record reflects that the State's initial closing argument was substantive. That initial closing argument addressed the circumstances surrounding the shooting in this case; the evidence or lack thereof; the State's burden of proof; the jurors' duties and obligations; the charges in the indictment; and the law applicable to those charges, among other things.

---

[7] Even though *Hyden* was decided when the old evidence code was in effect, OCGA § 17-8-71 is not part of the evidence code and was not impacted by the passage of the new evidence code.

44

Therefore, given that the law permits the State to waive opening argument, see OCGA § 17-8-71, which the State actually elected *not* to do here, Larkins's final claim also fails. See *Lewis v. State*, 283 Ga. 191, 194–95 (2008) (concluding that OCGA § 17-8-71 permits the waiver of initial closing arguments by the State). See also *Petty*, 283 Ga. at 270.

*Judgment affirmed. All the Justices concur, except Warren, P. J., not participating.*